Carolyn J. Johnsen, (#011894)
cjjohnsen@dickinsonwright.com
M. Kimberly Stagg (TN #16820)
kstagg@dickinsonwriht.com - *Pro Hac Vice Pending*
**DICKINSON WRIGHT PLLC**
1850 North Central Avenue, Suite 1400
Phoenix, Arizona  85004
Phone: (602) 285-5000
Fax: (602) 285-5100
*Proposed Attorneys for Debtor*

# IN THE UNITED STATES BANKRUPTCY COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| In re:<br><br>THE ROOMSTORES OF PHOENIX, L.L.C., d/b/a THE ROOMSTORE,<br><br>Debtor. | Chapter 11 Proceeding<br><br>No. 2:15-bk-15898-DPC<br><br>**EMERGENCY MOTION FOR ENTRY OF AN ORDER (A) AUTHORIZING DEBTOR TO ASSUME PRE-PETITION EXECUTORY CONTRACT AND (B) AUTHORIZING THE DEBTOR TO CONDUCT A GOING-OUT-OF-BUSINESS SALE**<br><br>**Hearing Date: TBD**<br>**Hearing Time: TBD** |

The RoomStores of Phoenix, LLC, d/b/a The RoomStore (the "Debtor" or the "Company"), debtor and debtor-in-possession in the above-captioned case, files this *Motion for Entry of an Order (A) Authorizing Debtor to Assume Pre-Petition Executory Contract and (B) Authorizing the Debtor to Conduct a Going-Out-of-Business Sale* (the "Motion"), requesting  the Court to enter an Order authorizing the Debtor to assume a December 10, 2015 Sale Promotion Consulting Agreement (the "Agreement" attached as **Exhibit A**) by and among the Debtor and a joint venture comprised of International Rug Group, LLC, a Connecticut limited liability company d/b/a International Retail

Group ("IRG"), Watch Hill Furniture Capital, LLC, a Delaware limited liability company ("Watch Hill"), and SB Capital Group, LLC, a Delaware limited liability company ("SB") (collectively referred to as the "Consultant"). The Agreement provides for the Consultant to act as Debtor's exclusive agent for conducting "going-out-of-business" type sale events at the Debtor's multiple store locations. The Debtor also requests authority to proceed with such sale events. The Debtor supports the Motion with the contemporaneously filed *Declaration of Alan Levitz in Support of First Day Motions* (the "Levitz Declaration"), the following Memorandum of Points and Authorities, and all matters of record.

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.      <u>JURISDICTION AND VENUE.</u>**

1.      On December 18, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

2.      Pursuant to Bankruptcy Code §§ 1107 and 1108, the Debtor continues to operate its business and manage its assets as debtor in possession.

3.      This Court has jurisdiction over these Chapter 11 proceedings under 28 U.S.C. §§ 157 and 1334.

4.      These matters constitute core proceedings under 28 U.S.C. § 157(b)(2).

5.      The Debtor is an Arizona limited liability company with its principal place of business in Phoenix, Maricopa County, Arizona.

6.      Venue of Debtor's Chapter 11 proceedings is proper in this District under 28 U.S.C. §§ 1408 and 1409.

7.      The relief requested by this Motion may be granted in accordance with the provisions of 11 U.S.C. §§ 105(a), 363, 365, FED. R. BANKR. P. 9006(c) and 9007, and LOCAL R. BANKR. P. 9013-1(h).

## II.  FACTUAL BACKGROUND

### A.  Corporate Structure and Management

1.     The Debtor is a furniture retailer providing premier furniture and accessories for a low price.  It currently operates 11 leased showroom locations, each known as the "RoomStore," including 9 located in the Phoenix, Arizona metropolitan area, one in Casa Grande, Arizona, and one in Prescott, Arizona (also referred to as the "Locations").  One location, on Alma School Road, consists of two storefronts including a Clearance Center and a full line store. The Debtor also leases a warehouse from which it fills furniture orders and deliveries.

2.     The Debtor is an Arizona Limited Liability Company and was formed in 1993. Its members consist of Alan Levitz (33.5%), Phil Levitz (33.5%) and Dan Selznick (33.0%). Alan Levitz currently serves as the managing member and oversees all operations of the business. Upper management includes Mark Hendricks as the controller, Margaret Raborn as Merchandise Manager, Jeff Conti as Warehouse Operations Manager, Mike Norris as Sales Director, and a store manager for each of the Locations.  The Company has approximately 350 employees.

### B.  Assets and Liabilities

3.     Debtor's assets consist principally of furniture and accessories inventory believed to have a value of approximately $8 million; accounts receivable in the approximate amount of $250,000; Company furniture, fixtures and equipment believed to have a value of approximately $325,000; and the rights pursuant to the Agreement as described below.

4.     Debtor's secured debt consists of the following: a) Broyhill Furniture Industries Inc./Heritage Home Group LLC in the approximate amount of $190,000 and b) Sealy, Inc. in the approximate amount of $984,000;  each allegedly secured by a purchase

money security interest in certain furniture inventory and the proceeds resulting therefrom. Debtor also may have secured debt in connection with 8 leased vehicles, for which payments were current through December 10, 2015. Finally, Synchrony Bank, which provided financing to Debtor's customers pre-petition, has asserted a lien in certain accounts established in connection with its financing program and any unpaid returned goods that were financed. Any amount that may be owed to Synchrony is believed to be immaterial, and Synchrony holds a letter of credit secured by a collateral account in which $100,000 is on deposit with the Bank of Arizona.

5.      The Debtor is current on all taxes and is in arrears for one month's rent for its leases of the Locations and warehouse. Unsecured debt is approximately $9,000,000.

**C.      History of the Debtor and Circumstances Leading Up to the Bankruptcy Filing**

6.      The Company began in 1993 with two stores and over the years expanded to a multiple locations in the Phoenix Metropolitan Area and further expanded to Prescott, Arizona and Casa Grande, Arizona. Prior to the severe economic downturn in 2008, the Company had as much as $125 million in annual gross sale revenues.

7.      The housing market crash that began in 2008 severely affected the retail furniture industry, and along with all retailers, the Company suffered dramatic declines. However, even when the market began to improve, competition among furniture retailers in the same genre as the RoomStores increased significantly and the Company could no longer generate the revenues it had accomplished in the past. Because of the increased competition, margins were reduced substantially.

8.      Gross sales revenues were approximately $76,200,000 in 2013, about $70,700,000 in 2014, and are expected to total about $63,000,000 for 2015. The Company

had net income of about $765,000 in 2013, but suffered a loss of about $476,000 in 2014, and expects the loss in 2015 will quadruple because of the rapid margin decline.

9.  Recognizing the immediate need to stem the losses, maintain cash flow and find a solution that would protect vendors and other creditors, Mr. Levitz began, in the third quarter of 2015, to entertain the possibility of hiring a company to assist with a promotional or liquidation sale.

10.  By way of background, Mr. Levitz has over 23 years' experience in the retail furniture business including working with his father and uncle who co-founded Levitz Furniture, a large national furniture chain.  He has managed operations for the Debtor since its inception.

11.  In addition, he gained extensive experience in the furniture retail industry when was asked to serve as the "designated responsible party" for a Chapter 11 case filed in Sacramento, California in June of 2008 by the RoomSource, a company owned by Phillip Levitz, Dan Selznick and Harris Blickstien. In that capacity, he dealt extensively with a liquidator and became familiar with practices and procedures in conducting liquidation sales.

12.  In the late fall of 2015, several companies in the furniture sale/liquidation business contacted Mr. Levitz and offered their services to liquidate the Company's inventory. None of the proposals were acceptable.  Mr. Levitz was particularly cautious in proceeding down this path given his experience with the Sacramento bankruptcy.

13.  In or about November 2015, Mr. Levitz received a recommendation regarding a promotional sales joint venture group led by IRG, and including Watch Hill and SB (referred to as the "Consultant").  Mr. Levitz began discussions regarding a plan in which the Consultant would provide management expertise and advances to pay certain operating costs, and then Consultant would conduct a sale of the Debtor's inventory. Such an

agreement contemplated a Chapter 11 bankruptcy filing in order to facilitate the process and provide a respite from certain aggressive creditors.

14. Mr. Levitz had already considered that a Chapter 11 might be a viable option for the Company. He also considered conducting a liquidation sale; however, the shortage of funds was going to be problematic.

15. Mr. Levitz contacted the representatives of two well-established furniture liquidators and described to them the Consultant's proposal. Neither of them could match the terms.

16. A third liquidator he contacted indicated that he could not match the Consultant's proposal but believed he could simply provide better service. He indicated that it sounded like a generous deal which should be lucrative for the RoomStore.

17. Mr. Levitz also contacted the credit manager of one of the Company's larger vendors and received a positive report on her company's experience in working with the Consultant.

18. In considering the Consultant's proposal, Mr. Levitz focused on the fact that it (a) entails a sizeable up-front payment (105% of the inventory cost value described below and a guaranteed percentage of the profits; (b) provides for the sale expenses to be paid by the Consultant if there are insufficient funds from sales, thereby having no effect on the amounts preserved for the creditors; and (c) provides that if sales exceed the minimum guaranteed percentage, there will be more money paid to the estate for the benefit of the creditors. If sales do not meet expectations, the amounts paid up front are still preserved for the benefit of the creditors. In Mr. Levitz' view, and by comparison, this approach offers a much cleaner arrangement than the others he reviewed and had experienced in which the estate bears the burden and risks of the liquidator's expenses.

-6-

19.    As part of his due diligence, Mr. Levitz reviewed the percentages of recovery in similar bankruptcy liquidation sales.  He found that the guaranteed up-front payment in other cases was significantly lower than the 105% offered by the Consultant. For example, in the cases of In re DD-OH Family Partners, LLC, In re Paul Rosa, Inc., and In re Wickes Furniture Company, Inc., the percentages were only 85%, 73%, and 50.25% respectively.

20.    Finally, it became clear that the Consultant would be able to start immediately, and thus capture January sales, which are traditionally the highest of the year.  Missing the January selling season would cause the outcome of the sales event to be significantly worse and potentially further erode the benefit to the creditors.

21.    The ability for the Consultant to conduct a large sale event immediately was the best solution to stop the fiscal drain the Company was experiencing.

22.    Based on all of the considerations outlined above, the Debtor executed the Agreement on or about December 10, 2015, and as contemplated, filed a voluntary Chapter 11 proceeding on December 18, 2015.

D.    **The Consulting Agreement**

23.    In short, the Agreement provides for the Consultant to serve as the Debtor's agent to provide the necessary assistance and oversight to conduct a going-out-of-business sale (or such similarly themed sale event) at the Locations in exchange for a) certain pre-petition advances to the Debtor to pay critical operating expenses and extinguish significant secured debt; b) the payment of sale expenses including rent and certain payroll expenses ; (c) the payment by the Consultant to the Debtor of a guaranteed amount based on a valuation of the Debtor's inventory; and (d)  payment by the Consultant to the Debtor of a percentage of the sale proceeds.   The Consultant receives as compensation a portion of the proceeds generated.

-7-

24. The pertinent provisions of the Agreement are as follows:[1]

    a. <u>Consultant's Role</u> (Para. 2): The Consultant's role is to serve as the exclusive agent of the Debtor to conduct sales events at each of the Locations and to provide the necessary assistance, staff, and oversight to accomplish such events.

    b. <u>Payment of Sale Expenses</u> (Para 2f): Beginning December 16, 2015, the Consultant will assume responsibility for all Sale Expenses (4.4) which includes rent, payroll, maintenance, utilities, advertising, supplies and the like.

    c. <u>Inventory Taking</u> (Para. 3.1): The Consultant will take a physical inventory and determine the Company Inventory (essentially home furnishings and accessories) that is to be sold in the sale events and the Excluded Inventory such as damaged merchandise as identified in Exhibit B of the Agreement that will not be sold in such events.

    *d.* <u>Valuation</u> (Para. 3.2): The Consultant will value the Company Inventory at 105 percent (105%) (the "Guaranty Percentage") of the Cost Value defined to be the actual invoice cost of each item excluding freight. This establishes the "Guaranteed Amount" to be paid to the Debtor immediately after the entry of the Order approving this Agreement (also referred to as the "Approval Order"). (*<u>Note: if the Approval Order is not entered by</u> **January 8, 2016,** <u>the Guaranty Percentage is reduced by 1% each day</u>*.)

    e. <u>Advances</u> (Para. 3.3): The Agreement provides for the Consultant to make an "Initial Advance" to the Debtor in the amount of $750,000 to be used for operational expenses as outlined in Exhibit C to the Agreement and a "Second Advance" to be used to pay the Debtor's secured debt held by BOKF, NA and American Express Bank, FSB. The Initial Advance has been paid to the Debtor. The Second Advance has been paid to BOKF in the amount of $200,500 and American Express Bank in the amount of $663,448.82 in satisfaction of their respective debts. The Advances as well as any of Debtor's obligations under the Agreement are secured by the Debtor's assets.

    f. <u>Payment of Guaranteed Amount</u> (Para. 3.3(d)): The Guaranteed Amount less the Advances described above will be paid to the Debtor within two days after the Approval Order.

---

[1] The descriptions of the pertinent terms of the Agreement are for ease of reference and only represent a summary of the Agreement. Parties should read the Agreement in its entirety. In the event of any inconsistency between the description set forth in this Motion and the terms of the Agreement, the Agreement shall control. Capitalized terms set forth in the description not otherwise defined shall have the meanings as set forth in the Agreement.

g.  Sales Override (Para. 3.4):  The Consultant will also pay the Debtor a percentage of the Gross Sales that include sale proceeds from Company Inventory as well as "Additional Merchandise" owned by the Consultant but included in the sales. The percentage increases with the volume of the sales.  The Consultant guarantees that the minimum Sales Override will be $450,000 and will be paid two days after the Approval Order.

h.  Use of the Payments Made to the Debtor (Para. 3.5): From its payments, the Debtor will first, immediately escrow funds estimated to pay its secured creditors the value of their collateral. Second, the Debtor will deposit into a "Pre-sale Order Account," an amount to be used in connection with the completion of pre-sale orders made by the Debtor. The amount is to be calculated in accordance with Exhibit E to the Agreement.  All remaining amounts will be held by the Debtor to be used as permitted by the Bankruptcy Code and ultimately distributed to creditors.

i.  Sale Term (Para. 4.2):  The sale events shall terminate 180 days after the Approval Order, however the Consultant may terminate a sale event at a Location upon 30 days' notice. (*Note however that the Agreement terminates automatically on* **January 15, 2016** *if the Approval Order has not been entered.)*

j.  Pre-Sale Orders (Para. 4.7):  The Consultant will assist the Company in fulfilling customer orders for which a deposit was made prior to the start of the sale events. Proceeds from Pre-Sale Orders will be deposited into a separate Pre-Sale Account from which will be deducted Consultant's expenses and a 10 percent (10%) fee.  The remaining proceeds will be remitted to the Debtor.

k.  Employees (Para. 4.9):  The Consultant will have the right to select employees it wishes to work at the sales events and will be responsible for providing funds for their wages. The Consultant does not have the right, however, to terminate any employees.  In accordance with the Agreement, the Company has given the requisite WARN Act notices to Company employees. Mr. Levitz will receive a weekly salary of $9,615.38 which will be paid by the Consultant and not the Debtor.

l.  Additional Merchandise (Para. 5):  Consultant will be entitled to include in the sale events Additional Merchandise that will remain the exclusive property of the Consultant.  Proceeds from the sale of the Additional Merchandise are included in the Gross Sales from which is calculated the Debtor's Sales Override percentage.

m.  Auction (Para 6):  The Consultant shall have the right prior to the expiration of the Sale Term to conduct an auction of remaining Company Inventory and Additional Merchandise.  The proceeds will be included in the Gross Sales for purposes of the Sales Override.

-9-

n. <u>Reconciliation</u> (Para. 7): A final reconciliation will occur within 30 days after the Termination Date.

## III. BASIS FOR THE REQUESTED RELIEF

25.     The Debtor seeks approval of the Agreement and the proposed going-out-of business sale because this process provides the best means of maximizing recovery to creditors of this estate. As indicated above and supported by the Levitz Declaration, the Debtor explored multiple alternatives to hiring this Consultant and also considered conducting its own liquidation. However, without a source of funds to sustain general operations, much less purchase new inventory, the Debtor believed its losses would continue on a downward spiral and reduce or even eliminate any possible return to creditors.

26.     Through the Agreement, the Debtor has a guarantee that expenses will be paid, that administrative expenses can be minimized, that current customer orders for merchandise will be filled, and that there will be a sizeable return to the Company that can and will be used to pay creditors.

## IV. LEGAL ARGUMENT

### A. The Assumption of the Agreement is in the Best Interest of Creditors and Should Be Approved

27.     Bankruptcy Code § 365(a) provides that a debtor-in-possession "subject to the court's approval, may assume or reject any executory contract." 11 U.S.C. § 365(a).

28.     The court uses a business judgment standard to determine whether to approve assumption or rejection under 11 U.S.C. § 365(a). *In re G.I. Indus.*, 204 F. 3d 1276 (9th Cir. 2000) (citing *NLRB v. Bildisco & Bildisco*, 465 U.S. 513, 523, 104 S. Ct. 1188, 79 L. Ed. 2d 482 (1984)). When applying the business judgement standard in the context of bankruptcy, the bankruptcy court should presume that the debtor-in-possession acted prudently, on an informed basis, in good faith, and in the honest belief that the action taken was in the best

-10-

interests of the bankruptcy estate. *In re Pomona Valley Med. Group, Inc.*, 476 F.3d 665, 670 (9th Cir. Cal. 2007) (citing *Navellier v. Sletten*, 262 F.3d 923, 946 n.12 (9th Cir. 2001); *FDIC v. Castetter*, 184 F.3d 1040, 1043 (9th Cir. 1999); *In re Chi-Feng Huang*, 23 B.R. 798, 801 (9th Cir. BAP 1982)).

29.     Under the business judgment rule, a court should approve a debtor's proposed assumption if it will benefit the estate.  *In re X10Wireless Tech*, 2005 Bankr. LEXIS 3376, *8-9 (9th Cir. BAP 2005). Unless it can be established that the debtor's decision "was one taken in bad faith or in gross abuse of its retained business judgment," the court should approve the debtor's assumption or rejection determination.  See, e.g. *In re Trans World Airlines, Inc.,* 261 B.R. 103 (Bankr.D.Del. 2001).

30.     As set forth above and in the Levitz Declaration, the Debtor has evaluated several options for maximizing the assets of its estate, including conducting its own liquidation sale.  None of the options that the Debtor explored would result in a return to the estate greater and as quickly as the return provided for in the Agreement.

31.     The Debtor does not have a bank line or sufficient cash to sustain operations and fulfill its pre-sale orders, much less purchase new inventory or fund a liquidation sale. The payment of the Guaranteed Amount, the Sales Override Amount and Sale Expenses by Consultant provides the Debtor with cash during this liquidation process which maximizes the value of the estate for ultimate distribution to creditors. If the Debtor does not immediately assume the Agreement, the value of the return to the estate will be greatly reduced.

32.     The Agreement establishes a procedure for the payment of secured creditors. Two of the creditors BOKF and American Express which held security interests on all of Debtor's assets were paid in full pre-petition thereby enabling the Consultant to make the

-11-

necessary Advances to fund the Debtor's immediate and critical operational needs. Monies will be escrowed for the payment of the remaining five secured creditors based on the value of their collateral.

33. The Agreement was an arm's length transaction entered into in good faith. The assumption of the Agreement is clearly in the best interests of the Debtor, its estates, all creditors and parties in interest. The proceeds of the Guaranteed Amount will be sufficient to satisfy all of the Debtor's secured creditors who have a perfected lien on the Company Inventory in existence as of the Sale Commencement Date. In addition, the Debtor anticipates that after satisfaction of the secured claims, the remaining portion of the Guaranteed Amount, combined with the Sales Override Amount, will pay administrative expense claims in full, and is expected to pay priority unsecured claims in full and also provide for a distribution to general unsecured creditors.

34. The Debtor has satisfied the business judgment rule and demonstrated the benefit to creditors derived from the Agreement. The Debtor requests that assumption of the Agreement be approved.

**B.** **The Going Out of Business Sale Should be Approved**

35. Bankruptcy Code § 363(b) authorizes a debtor-in-possession, subject to Court approval and after notice and a hearing, to use, sell or lease property of the estate, outside the ordinary course of business. *See In re Dant & Russell, Inc. 853 F.2d 700, 703-704 (9th Cir. 1988); In re Ames Dept. Stores, Inc.*, 136 B.R. 357, 359 (Bankr. S.D.N.Y. 1992) (noting that "going-out-of-business" sales are governed by § 363(b)).

36. To obtain court approval to use property under § 363(b) of the Bankruptcy Code for the purpose of a sale such as proposed in this matter, the debtor need only show a legitimate business justification for the proposed action. *See, e.g., Myers v. Martin (In re*

*Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper (In re Schipper)*, 993 F.2d 513, 515 (7th Cir. 1991)); *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (7th Cir. 1983); *In re One Vision Park, Inc.*, 2010 Bankr. LEXIS 1661, *3(Bankr. N.D. Cal, June 2 2010) citing *In re 240 North Brand Partners, Ltd.,* 200 B.R. 653, 659 (9th Cir. BAP 1996).

37.    In interpreting Bankruptcy Code § 363(b), courts have approved sales of assets, including those of substantially all of the debtor's assets, prior to confirmation. See, e.g., *In re Qintex Entm't, Inc.*, 950 F.2d 1492 (9th Cir. 1991). Store closing or liquidation sales are a routine part of chapter 11 cases involving retail debtors.  *See, In re Ames Dept. Stores, Inc.* 136 B.R. at 359 (holding that "going-out-of-business" sales are an important part of "overriding federal policy requiring a Debtor to maximize estate assets").

38.    At this juncture the Debtor is unable to continue to operate its business on a going forward basis as the expenses continue to substantially exceed profits.  Absent the sales events as proposed in the Agreement, any profits to be received will cover expenses with little or no return to unsecured creditors.  As such, the Debtor respectfully submits that it believes that in its sound business judgment it must conduct the Sale.  Based upon the current market conditions and the present status of the furniture business in general, the Debtor believes that the liquidation of its inventory is in the best interests of creditors and provides the most efficient mechanism to maximize value.

39.    As such, the Debtor requests the Court authorize the sale events as described in the Agreement.

## C.    Leasehold Restrictions on Going Out of Business Sales are Unenforceable

40.    Certain of the leases governing the Debtor's stores may contain provisions purporting to restrict or prohibit the Debtor from "going dark" and/or conducting going-out-

-13-

of-business sales, store closing, liquidation or similar sales at the Sales Locations. Such provisions are unenforceable in chapter 11 cases as they constitute an impermissible restraint on a debtor's ability to maximize the value of its assets under Bankruptcy Code § 363. See, e.g., *In re R.H. Macy & Co., Inc.*, 170 B.R. 69, 77 (Bankr. S.D.N.Y. 1994) (holding restrictive lease provisions unenforceable in chapter 11 case when debtor sought to conduct going-out-of-business sale); *In re Ames Dept. Stores, Inc.,* 136 B.R. at 359 ("[T]o enforce the anti-GOB sale clause of the Lease would contravene overriding federal policy requiring Debtor to maximize estate assets by imposing additional constraints never envisioned by Congress").

41. Accordingly, no clause in any of the leases for the Locations should act as an impediment to the sales or any activities in connection therewith. To the extent that any such restrictions exist in the leases, the Debtor requests that the Court grant to the Debtor and Consultant authority to conduct the sale events without complying with such restrictive lease provisions and prevent lessors from (1) interfering with or otherwise restricting the Debtor and Consultant from conducting the sales and, (2) seeking to recover damages for breach of the restrictive provisions.

42. The Agreement and the proposed Order seeking to protect and properly maintain the Locations during the sale events. In addition, Consultant shall be responsible for, and the landlords shall be paid, per diem rent for the use of the respective Locations during the Sale and any rent required to be paid under 11 U.S.C. § 365 that is not paid by Consultant will be paid by the Debtor. As such, the landlords are protected throughout the sale process.

-14-

### D. Sale of the Property Free and Clear of Liens

43. The sale of Company Inventory must be made free and clear of liens. The Debtor believes that the Company Inventory is subject only to the lien held by the Consultant which is consenting to the sale in accordance with the Agreement.

44. However, in the event there are any valid liens on the Company Inventory, such liens will attach to the Guaranteed Amount and will be paid upon determination by the Court (or with the parties' consent) of the validity and extent of such secured parties' liens on the Company Inventory.

45. Consequently, the Debtor requests the approval of the sale free and clear of liens.

### E. Waiver of Stay and Critical Timing

46. The Debtor's need to effectuate the Agreement and the contemplated sales without waiting the ten (10) day period provided for under Bankruptcy Rule 6004(h) is acute. The failure to expeditiously consummate the transactions under the Agreement will have a significantly adverse impact upon the value to be realized upon the disposition of the Debtor's inventory. The transaction is extremely time sensitive, as the dates reflected in the Agreement make clear. In addition, the Debtor's liquidity concerns also compel the Debtor to effectuate the Agreement as expeditiously as possible.

47. Should there be any delay in approval, the benefit of January sales, which are typically high, will be lost. Hence the 1% reduction per day in the guaranteed percentage will be triggered if the order approving this Motion is delayed past January 8, 2016.

48. As such, the Debtor requests that any Order approving the relief requested herein be effective immediately and that any applicable stay period under the Bankruptcy Rules is deemed inapplicable and/or waived.

-15-

## V.  NOTICE

49.  Notice of this Motion has been given to (i) the Office of the United States Trustee, (ii) Debtor's secured creditors; (iii) counsel for the Consultant, (iv) the Debtor's twenty (20) largest unsecured creditors; (iv) Debtor's landlords.

50.  No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests entry of an Order (a) authorizing the Debtor to assume the Agreement; (b) authorizing the Consultant to act as Debtor's exclusive agent for conducting a going out of business, bankruptcy liquidation, store closing and similarly themed sale; and (c) granting such other and further relief as is just.

Dated:  December 18, 2015.

DICKINSON WRIGHT PLLC


By: /s/ Carolyn J. Johnsen
    Carolyn J. Johnsen
    M. Kimberly Stagg – *Pro Hac Vice Pending*
    *Proposed Attorneys for Debtor*


**FOREGOING** electronically filed with the Clerk of the U.S. Bankruptcy Court for the District of Arizona this 18th day of December, 2015, with a **COPY** served this same date via e-mail on the following parties:

Elisabeth C. Amorosi
U.S. TRUSTEE'S OFFICE
230 N. First Avenue, Suite 204
Phoenix, AZ  85003
elizabeth.c.amorosi@usdoj.gov
USTPRegion14.px.ecf@usdoj.gov
*Attorneys for the United States Trustee*

Robert A. Boghosian
COHEN TAUBER SPIEVACK & WAGNER P.C.
420 Lexington Avenue, Suite 2400
New York, NY 10170
rboghosian@ctswlaw.com
*Attorneys for Consultant*

And via email, facsimile or overnight mail on the following parties:

Landlords of Debtor.
Secured Creditors of Debtor.
20 Largest Unsecured Creditors of Debtor.


/s/ Lauri Andrisani

PHOENIX 53406-11 265628v3

# EXHIBIT A

December 10, 2015

The RoomStores of Phoenix, L.L.C., d/b/a The RoomStore
3011 East Broadway
Phoenix, AZ 85040
Attn: Alan Levitz

      Re: <u>High Impact Promotional Sale Event</u>

Dear Alan:

      This Sale Promotion Consulting Agreement (this "<u>Agreement</u>") is between The RoomStores of Phoenix, L.L.C., d/b/a The RoomStore, an Arizona limited liability company (the "<u>Company</u>"), and a joint venture comprised of International Rug Group, LLC, a Connecticut limited liability company d/b/a International Retail Group ("<u>IRG</u>"), Watch Hill Furniture Capital, LLC, a Delaware limited liability company ("<u>Watch Hill</u>"), and SB Capital Group, LLC, a Delaware limited liability company ("<u>SB</u>" and collectively with IRG and Watch Hill, the "<u>Consultant</u>").

      The Company is engaged in the retail sale of furniture, mattresses, rugs and home furnishings at its showroom locations set forth on <u>Exhibit A</u> attached hereto (each individually a "<u>Sale Location</u>" and collectively the "<u>Sale Locations</u>"). The Company also operates a warehouse and distribution center located at 3011 East Broadway, Phoenix, Arizona and identified on <u>Exhibit A</u> attached hereto (the "<u>Distribution Center</u>"). The Company desires to retain Consultant as the Company's exclusive agent to conduct a high impact promotional sale event (as further described herein, the "<u>Sale Event</u>" or "<u>Sale</u>") at the Sale Locations, and Consultant has agreed to do so in accordance with the terms and conditions of this Agreement. Accordingly, the parties hereby agree as follows:

1.    **Engagement**. The Company appoints Consultant as its exclusive agent to assist the Company to conduct the Sale Event and take such further action as set forth herein under the terms and conditions of this Agreement. In addition, the Company intends to commence a voluntary case ("<u>Chapter 11 Case</u>") with the filing of a petition on a certain date determined by Company ("<u>Petition Date</u>") under chapter 11 of Title 11 of the United States Code (the "<u>Bankruptcy Code</u>"),in the United States Bankruptcy Court for the District of Arizona (the "<u>Bankruptcy Court</u>"). The Company will continue to manage its affairs as a debtor and debtor in possession in the Chapter 11 Case pursuant to §§ 1107 and 1108 of the Bankruptcy Code; and, the Company intends to seek approval of the assumption of this Agreement in the Chapter 11 Case on an expedited basis immediately following the filing of the Chapter 11 Case.

      Notwithstanding anything herein to the contrary, if the Approval Order is not entered by the Bankruptcy Court on or before January 15, 2016, this Agreement shall terminate (unless otherwise mutually agreed by Company and Consultant), except for the provisions relating to the Advances, the Consultant Collateral and all rights and remedies of Consultant with respect to the Consultant Collateral and repayment of the Advances, all as described below. If this Agreement

is terminated by Consultant, the Advances (defined herein) shall be immediately due and payable and the Consultant shall have the right to exercise all of its rights and remedies against the Consultant Collateral (defined herein) and pursue all rights and remedies against the Company.

2. **Consultant Services**. In its capacity as Consultant hereunder, Consultant shall provide the Company with the following services, all in accordance with and to the extent permissible by applicable laws:

(a) Provide assistance and direction with Sale Event related operations, including, management, merchandising, display, pricing, tagging, advertising, satisfaction of Pre-Sale Orders (as defined below), sales, delivery, administrative, warehousing, clerical and other customer service;

(b) Provide a staff to consult with and assist the Company with the conduct of the Sale Event, such as managers and sales people, and clerical and other workers, as necessary for the conduct of the Sale Event;

(c) Make available its contacts, credit lines and purchasing power to provide the Sale Event with the Additional Merchandise (defined herein) to be sold during the Sale Event;

(d) Design advertising and other promotional material for the Sale Event;

(e) Provide day-to-day executive oversight of the onsite Consultant team and overall Sale Event, such oversight to include reasonable periodic in-person visits and daily remote oversight by Consultant's executives;

(f) On December 16, 2015 (the "Commencement Date"), assume responsibility for Sale Expenses (defined herein) pursuant to the terms and conditions of this Agreement, provided that in the event no Approval Order is obtained, the Sale Expenses and the Advances are the responsibility of the Company provided that, Consultant shall be responsible for the costs and expenses of Consultant's staff to conduct the physical inventory even if incurred before the Commencement Date as long as the Approval Order is entered;

(g) Provide the support of the Consultant central service staff and office to monitor, assist and support the Company and the on-site Consultant administrative team, including reasonable post-sale service matters;

(h) Provide such other Sale Event related services as Consultant and Company shall mutually agree; and

(i) Provide Company with information in Consultant's possession, which the Company does not otherwise possess, as reasonably requested by Company in order for Company to file accurate and complete monthly operating reports.

2

3.    **Inventory and Payments to the Company and Consultant**

3.1.    <u>Inventory Taking</u>.  Representatives of the Company and Consultant shall take a physical inventory of the Company Inventory (the "<u>Inventory Reconciliation</u>") commencing on or about December 14, 2015.  Consultant and Company shall mutually agree on inventory taking instructions (the "<u>Inventory Taking Instructions</u>") and shall use such industry standards to validate the accuracy of its physical inventory.  The Inventory Taking Instructions shall include among other matters, the treatment and handling of merchandise, cancelled customer order merchandise, on order merchandise and other reconciling matters sales.

(a)    "<u>Company Inventory</u>" means the Company's entire inventory of home furniture, rugs, accessories and home furnishings located at the Sale Locations and Distribution Center as of the date of the Inventory Reconciliation, but excluding Excluded Inventory.

(b)    "<u>Excluded Inventory</u>" means collectively (i) inventory upon which customer deposits have been made or taken, (ii) inventory held by the Company under a floor plan, concession, locker stock, consignment, purchase money security interest (unless there is a mutual agreement regarding such inventory among the holder of the purchase money security interest, Company and Consultant) or other similar arrangement, and (iii) severely damaged, unsaleable and/or used merchandise and parts, (iv) the items detailed on <u>Exhibit B</u> attached hereto. Excluded Inventory shall not be included in the Sale Event and Consultant shall have no expense or responsibility in connection with any goods not included in Company Inventory.

3.2.    <u>Valuation of Company Inventory</u>.

(a)    Consultant and the Company shall value Company Inventory at one hundred and five percent (105%) (the "<u>Guaranty Percentage</u>") of the Cost Value of the Company Inventory (the "<u>Guaranteed Amount</u>").  As used herein, "<u>Cost Value</u>" shall mean, with respect to each item of Company Inventory, the actual invoice cost of such item excluding freight.   The Company shall reasonably provide Consultant with manufacturers' invoices to establish the Cost Value of Company Inventory.  If the parties cannot verify the actual Cost Value of any item of Company Inventory, the Cost Value for such item will be extrapolated based upon the retail price of such item divided by the Company's historical margin factor for the applicable vendor.  The Guaranty Percentage shall be reduced by one (1) percentage point for each day after January 8, 2016, until the first day after the Approval Order is entered by the Bankruptcy Court.

(b)    Company represents and warrants that the aggregate Cost Value of the Company Inventory as of the Commencement Date shall not exceed $8,000,000.

3.3.    <u>Advances and Payments</u>.

(a) The Consultant shall make Advances to Company. As used herein, "Advances" means all amounts advanced by Consultant to the Company or otherwise in furtherance of this Agreement prior to the entry of the Approval Order (to the extent that the Advances have not been repaid or reimbursed to Consultant from proceeds of Company Inventory) including advances for payments of (i) the Initial Advance (defined herein), (ii) the Second Advance (defined herein), (iii) Sale Expenses (defined herein), (iv) the Shortfall (defined herein), (v) to the extent no Approval is entered, the costs and expenses of Consultant's staff to conduct the physical inventory and the Inventory Reconciliation prior to the Commencement Date, and (vi) such other amounts requested by Company and agreed to by Consultant.

(b) The initial amount of the Advances shall be $750,000 ("Initial Advance") pursuant to the budget attached hereto as Exhibit C, which Initial Advance shall be paid to the Company by December 11, 2015, or such later date as Consultant has completed with reasonable diligence and Consultant's verification of the filing of its Uniform Commercial Code financing statements to perfect the security interests in the Consultant Collateral pursuant to Section 13 herein. The amount of the Initial Advance shall be used by the Company to pay the to pay the items as set forth on Exhibit C.

(c) The second Advance shall be an amount not to exceed $900,000 ("Second Advance"), which shall be paid upon Company's presentation of payoff letters satisfactory to Consultant evidencing a full payoff amount necessary to obtain a release of the security interests held by BOKF, NA and American Express Bank, FSB (collectively, the "BOKF and AmEx Secured Parties"). The amount of the Second Advance shall be used to satisfy the payoff letters from BOKF and AmEx Secured Parties and effectuate a release and termination of the security interests held by the BOKF and AmEx Secured Parties.

(d) Within two (2) business days after entry of the Approval Order provided there is no stay, Consultant shall pay the Guaranteed Amount (less the aggregate amount of the Advances excluding Advances for Sale Expenses) to Company which shall be disbursed pursuant to Section 3.5.

3.4.  Additional Compensation Payable to Company.  In addition to the Guaranteed Amount, Consultant shall pay to Company, an additional fee equal to the percentage set forth below of applicable Gross Sales (defined herein) sold and delivered during the Sale Event (the "Sales Override").

| Gross Sales | Sales Override Percentage |
| --- | --- |
| $0 to $30,000,000 | 1.0% on said sales up to $30,000,000 |
| $30,000,001 to $50,000,000 | 1.5% on said sales between $30,000,001 to $50,000,000 |
| $50,000,001 and greater | 2.0% on said sales from $50,000,001 and greater |

{00276321.DOCX; 4}

The Consultant guarantees that the minimum Sales Override shall be $450,000 (the "Minimum Sales Override Amount"). The Minimum Sales Override Amount shall be paid to the Company when the Guaranteed Amounts is to be paid pursuant to Section 3.3.

As used herein, "Gross Sales" shall mean the entire amount of proceeds received (net of sales taxes and delivery charges) from all sales of merchandise made at the Sale Locations during the Sale Term, including, for this purpose, all sales of (i) Company Inventory and (ii) all sales of Additional Merchandise.

As part of the final reconciliation pursuant to Section 7.2, Consultant and Company shall reconcile the Sales Override and to the extent the Sales Override is in excess of the Minimum Sales Override Amount, the Consultant shall pay the balance of the Sales Override to Company.

   3.5.   Company's Use of Guaranteed Amount and Sales Override.   Payments of the balance of the Guaranteed Amount (being the Guaranteed Amount less the aggregate amount of the Advances excluding Advances for Sales Expenses which such Advances shall be retained by the Consultant from the Guaranteed Amount pursuant to Section 3.3(d)) and Sales Override shall be used by Company as follows:

        (a) First, the Company shall hold in escrow, unless and until otherwise required by a Bankruptcy Court order, an amount estimated to satisfy the claims of all the Secured Parties (defined herein) (other than the BOKF and AmEx Secured Parties) but only to the extent of the value of such Secured Parties' collateral as of the Petition Date ("Escrowed Proceeds").

        (b) Second, a mutually agreeable amount calculated as of the Approval Order date utilizing the formula for calculating the amounts in accordance with in Exhibit E attached hereto to be deposited in the Pre-Sale Order Account (defined herein) and to be used by the Consultant in connection with the completion of Pre-Sale Orders in accordance with Section 4.7 herein (the "Backlog Amount"); and

        (c) Third, the Company shall use all remaining funds as permitted under the Bankruptcy Code or applicable orders of the Bankruptcy Court.

   3.6.   Replacement Liens. To the extent Secured Parties were not paid the value of their collateral in full prior to Petition Date, upon the sale of Company Inventory, the parties acknowledge that any properly perfected liens of each Secured Party in the Company Inventory shall attach to the Escrowed Proceeds pending further order of the Bankruptcy Court up to the value of the Secured Party's collateral as of the Petition Date.  The Escrowed Proceeds will remain property of the estate until such time as interested parties have had an opportunity to investigate the validity, perfection, and extent of any alleged secured interests and liens and nothing herein is intended to waive or release any third party's rights to avoid or challenge such interests and liens.

   3.7.   Setoff.  The Company agrees that any amounts due to Consultant by the Company pursuant to this Agreement may in the Consultant's discretion be offset by the Consultant against

{00276321.DOCX; 4}

any amounts due to the Company pursuant to this Agreement. Consultant agrees that any amounts due to Company by the Consultant pursuant to this Agreement may in the Company's discretion be offset by the Company against any amounts due to the Consultant pursuant to this Agreement.

4. **Conduct of the Sale Event**

4.1.    Theme of Sale Event.  Prior to the filing of the Chapter 11 Case, the Sale Event shall be conducted as a series of high-impact events to (a) liquidate excess inventory, and (b) restructure the Company's operations and debt.  After the filing of the Chapter 11 Case and upon entry of the Approval Order, the Sale Event shall be conducted as a "Store Closing," "Going Out Of Business," "Bankruptcy Liquidation," and similar themed sales.

4.2.    Duration of the Sale.  The Sale Event shall commence on the Commencement Date, and the Sale Event (and, if applicable, the Auction) shall terminate 180 days after entry of the Approval Order (the "Termination Date;" the period from the Commencement Date to the Termination Date being referred to herein as the "Sale Term").   The Sale Term may be terminated at the option of Consultant, on a Sale Location by Sale Location basis, prior to the Termination Date, upon not less than thirty (30) days prior written notice.  The Sale Term may be extended, on a Sale Location by Sale Location basis, upon mutual written agreement of the parties. At the conclusion of the Sale Term at all of the Sale Locations, the parties shall conduct a final reconciliation pursuant to Section 7.2.  In addition, prior to the expiration of the Sale Term, Consultant may in its discretion, elect to cease using the Distribution Center upon thirty (30) days prior written notice to the Company, and Consultant's obligations to pay Sale Expenses related to the Distribution Center shall cease at the expiration of such notice period.  If necessary, the Company will diligently pursue a motion(s) with the Bankruptcy Court to extend the time to assume or reject the leases of the Sale Locations through the Termination Date, provided that no extension will be pursued for any Sale Location for which a sale termination notice has been given by Consultant.

4.3.    Sale Bank Account; Credit Card Facilities.  Consultant shall establish a bank account in the name of and controlled by Consultant (the "Sale Account") into which Consultant shall deposit all of the proceeds of the Sale Event and Auction and shall disburse the funds in the Sale Account in accordance with the terms herein.   Consultant shall have the right to utilize its own credit card terminals and merchant identification number for purposes of the Sale Event and all credit card proceeds of sales of merchandise through the Sale Event shall be deposited by Consultant in the Sale Account.

4.4.    Sale Expenses.  Consultant shall be responsible for, and shall pay from proceeds in the Sale Account, or directly if there are insufficient proceeds, all "Sale Expenses" incurred in conducting the Sale Event.  "Sale Expenses" means all operating expenses of the Sale which arise at the Sale Locations and Distribution Center during the Sale Term, limited to the following: (a) base rent and all other charges relating to the occupancy (including, without limitation, property taxes and CAM) on a per location and per diem basis in an amount not to exceed the aggregate per diem totals per location set forth on Exhibit A attached hereto; (b) all costs and expenses incurred in obtaining permits or licenses for the conduct of the Sale Event;

6

(c) liability, casualty and contents insurance premiums; (d) trash and snow removal; (e) ordinary course Sale Locations and Distribution Center housekeeping and maintenance; (f) ordinary course HVAC maintenance in an amount not to exceed $1,000 per month per Sale Location, not to exceed $7,500 per month in the aggregate; (g) utility charges; (h) equipment rental expense; (i) costs of fuel, day-to-day routine service and insurance for Company owned vehicles used in the Sale Event, if any, or at Consultant's option, the Company's current delivery service to the extent used at the Sale Event; (j) telephone and Internet service expense; (k) costs of transferring merchandise between the Distribution Center and the Sale Locations; (l) delivery charges; (m) Sale Location security, alarm service and armored car; (n) Sale Location music contracts; (o) additional warehouse space for the Sale, if necessary; (p) bank fees, credit card fees, check verification fees and chargebacks; (q) postage and courier services; (r) advertising and signage costs, including television, radio, print, direct mail, signs, banners, internet ads and social media costs, in each case, as approved by Consultant but specifically excluding agreements with sports team and other agreements that provide advertisement; (s) lodging expenses for all personnel referred to the Company by Consultant; (t) payroll for all store level (*i.e.* non-executive) personnel used at the Sale Locations payable on a per diem basis, including applicable federal, state and local payroll taxes, the portion of health insurance premiums actually paid by the Company for the Company's store level employees used in the Sale and currently entitled to such benefits in an amount not to exceed $315 per month per person, payable on a per diem basis, workers' compensation, Sales Personnel Commissions (defined herein) and any third party payroll service engaged by Consultant for the Sale; (u) supplies; (v) Consultant's legal fees and accounting expenses for the Sale Event and Consultant's costs for conducting the physical inventory and for the Inventory Reconciliation and the final Sale Event reconciliation; and (w) Consultants cost of capital.

Notwithstanding anything herein to the contrary, Consultant is solely responsible for Sale Expenses after the Commencement Date, provided that the Approval Order is entered.

4.5. <u>Non-Sale Expenses</u>. Sale Expenses shall exclude, without limitation, and Consultant shall not be responsible for, the following: (a) non-routine maintenance or repair expenses (including repair to the roof, structural portions and HVAC system at the Sale Locations and Distribution Center but excluding ordinary course maintenance and housekeeping expense); (b) executive compensation and executive employee benefits (including, without limitation, pension benefits, medical benefits, vehicles, vacation pay, holiday pay, sick days, leaves of absence, and severance pay) (other than the amounts associated with the retention of Alan Levitz (as detailed in Section 4.9(b) below)); (c) any Pre-Sale Order Expenses (defined herein); (d) any and all expenses incurred prior to or after the Sale Term, except for accounting expenses as provided in Section 4.4(v); (e) rent and all other charges relating to the occupancy of the Sale Locations and Distribution Center in excess of the amounts set forth in Section 4.4(a) and <u>Exhibit A</u>; (f) except as specifically provided in Section 4.4(t) above, any of Company's obligations relating to any of Company's employees including, without limitation, Worker Adjustment Retraining Notification Act ("<u>WARN Act</u>") claims and other termination type claims and obligations, or any other amounts required to be paid by statute or law; (g) all other costs and expenses that are not a Sale Expense (collectively, the "<u>Non-Sale Expenses</u>"). If the Consultant incurs a Non-Sale Expense, the Consultant shall have the right to reimburse itself from funds due to the Company under this Agreement. Except if necessitated by an urgent

situation, Consultant will notify the Company prior to incurring a Non-Sale Expense, thereby providing the Company with an opportunity to use its own funds to pay the Non-Sale Expense.

4.6.    Sales Tax.  During the Sale Term, sales tax with respect to the Sale Event shall be collected by the Consultant and shall, at Consultant's option, be either delivered to the Company or directly paid to the applicable taxing authority on behalf of the Company.  To the extent Consultant pays the sales tax to the applicable taxing authority, the Company shall execute all applicable reports and documents as required by the taxing authority in order for Consultant to remit such sales tax on behalf of the Company.  The Consultant shall use the Company's tax identification number when remitting sales tax to the applicable authority on behalf of the Company.  Consultant shall indemnify and hold Company harmless to the extent Consultant fails to remit sales tax to the applicable taxing authority or to pay such collected sales tax to the Company.

4.7.    Pre-Sale Orders and Expenses.

(a) The Consultant shall use commercially reasonable efforts to assist Company in fulfilling customer orders for which a deposit was made prior to the start of the Sale Event (hereinafter the "Pre-Sale Orders").

(b) All proceeds from Pre-Sale Orders shall be deposited into a separate bank account controlled by the Consultant (the "Pre-Sale Order Account").  The following expenses shall be paid to Consultant or as directed by Consultant from the Pre-Sale Order Account with respect to such Pre-Sale Orders (collectively, the "Pre-Sale Order Expenses"): (i) the invoice cost plus billed freight of the merchandise required to fulfill said Pre-Sale Orders, (ii) sales tax, (iii) sales personnel commission, and (iv) an amount equal to ten percent (10%) of the gross sales (excluding sales tax and delivery charges) amount of the Pre-Sale Orders for all other out-of-pocket expenses incurred by the Consultant to complete said Pre-Sale Orders, including, without limitation, preparation work, refinishing, administrative matters and salaries and wages relating to the completion and delivery of Pre-Sale Orders.

(c) Prior to the Commencement Date, the Company shall provide the Consultant with a complete and accurate list of all Pre-Sale Orders indicating the name, address and phone number of each customer; the total amount of money accepted or received on deposit from each customer; the balance due from each such customer; and the item(s) purchased by such customer.  Exhibit E attached hereto sets forth estimated amounts and a calculation as of the date of this Agreement in calculating the amount necessary to complete Pre-Sale Orders as of the date of this Agreement.

(d) Following fulfillment of all Pre-Sale Orders and payment of Pre-Sale Order Expenses, after the completion of the final reconciliation pursuant to Section 7.2, the balance of the Pre-Sale Order Account shall be paid to Company; provided, that the Company shall be responsible to pay Consultant any deficiency if there are insufficient funds in the Pre-Sale Order Account to pay the Pre-Sale Order Expenses (the "Shortfall").

8

4.8.    _Quiet Possession; Use of Existing Assets_.  Consultant shall have access to, and the right to the unencumbered use and occupancy of, and peaceful and quiet possession of, the Sale Locations and Distribution Center throughout the Sale Term.  During the Sale Term, Consultant shall have the exclusive right to use, without charge (except as expressly provided in Section 4.4 above), the Company's furnishings, fixtures, and equipment; customer lists and mailing lists; trade names, trademarks, logos and other intangible rights; computer hardware and software (including, without limitation, the Company's URL(s), website(s) and social media sites); vehicles, if any; supplies; and, any other assets of the Company located at the Sale Locations and Distribution Center.  Company shall provide Consultant access to and use of Company owned vehicles, if any, for purposes of providing shuttle service and limited delivery service for the Sale Event during the Sale Term.   The Consultant shall use the Company's trademarks, tradenames and the Company's URL(s), the Company's customer and mailing lists, website(s) and social media sites solely for conducting the Sale during the Sale Term in accordance with this Agreement and the Approval Order.  Any sale of the Company's trademarks, tradenames and the Company's URL(s), customer and mailing lists, website(s) and social media sites prior to the expiration of the Sale Term shall be subject to Consultant's rights to use such items pursuant to this Agreement and the Approval Order.

4.9.    _Salaried/Hourly Personnel and Sales (Commission) Personnel_.

(a)    _Company's Existing Employees_.  Company shall provide to Consultant prior to the Commencement Date information in reasonable detail with respect to all employees of the Company including, without limitation, current wages, salaries, commission rates and benefit costs for all such employees. Consultant shall have the right to select any such employees to work at the Sale Event and Auction, including all clerical, warehouse and sales personnel, and all such employees shall remain on the Company's payroll at a wage or commission mutually agreeable to the Company and Consultant. Prior to the Sale Commencement Date and after discussions with the Company, the Consultant shall determine those Company employees that will be utilized in connection with the Sale during the Sale Term (each such employee, a "Retained Employee").  Notwithstanding the foregoing, Company's employees shall at all times remain employees of the Company.  Consultant may in its discretion stop using any Retained Employee at any time during the Sale Term.  In the event that Consultant desires to cease using any Retained Employee, Consultant shall notify Company at least five (5) days prior thereto; provided, however, that, in the event that Consultant determines to cease using an employee "for cause" (such as dishonesty, fraud or breach of employee duties), the five (5) day notice period shall not apply; provided, further, however, that Consultant shall immediately notify Company of the basis for such "cause".  Notwithstanding the foregoing, Consultant shall not have the right to terminate the actual employment of any employee, but rather may only cease using such employee in the Sale and paying any Expenses with respect to such employee (and all decisions relating to the termination or non-termination of such employees shall at all times rest solely with Company).  The Company shall give WARN Act notices to all of the Company employees no later than the Petition Date.

The Company's federal and state tax identification numbers shall be used for the payment of salaries, wages, and commissions, including workmen's compensation benefits, to all such

9

{00276321.DOCX; 4}

existing employees. The Company shall be reimbursed on no less than a weekly basis for such payroll expenses from the Sale Account or directly by the Consultant in the event there are insufficient proceeds in the Sale Account. Such employees shall be under the direction of the Company, subject to the terms and conditions of this Agreement.

(b)     Alan Levitz.   In consideration of the devotion of his working time and energy to the performance of services on behalf of the Sale Event as may reasonably be requested by Consultant, Alan Levitz will receive from Consultant as a Sale Expense during the Sale Term (or such shorter period as Alan Levitz shall actually perform services) a gross weekly salary of $9,615.38 before deduction of applicable payroll taxes and withholding (the "Weekly Salary"), but as to which no other employee benefits shall be included or payable. Subject to Bankruptcy Court approval and provided that Alan Levitz continues to work during the Sale Term, Consultant guarantees that Alan Levitz will receive the Weekly Salary for the greater of (i) ninety (90) days, and (ii) the expiration date of the Sale Term. Company shall discontinue its payment of wages to Alan Levitz to the extent duplicative of the amounts to be paid by Consultant as a Sale Expense.

(c)     Personnel Referred by Consultant.

(i)     Clerical and Distribution Center Personnel. Consultant shall engage a professional employer organization or payroll service for the payment of salaries and wages, including workmen's compensation benefits, to all hourly and salaried personnel, such as warehouse and clerical personnel, that Consultant refers to work at the Sale Event and Auction. Such salaried and hourly personnel shall be under the direction of Consultant, subject to the terms and conditions of this Agreement.

(ii)     Salespersons and Managers. All salespersons and managers that Consultant refers to work at the Sale Event and Auction shall be independent contractors and shall receive their Form 1099s from Consultant. Such salespersons and managers shall be under the direction of Consultant, subject to applicable law and the terms and conditions of this Agreement.

(d)     Sales Personnel Commission.   Sales persons shall be paid a commission, on a weekly basis, equal to five percent (5%) of the Gross Sales amount (excluding sales tax and delivery charges) of merchandise sold by them at the Sale Event and delivered (the "Sales Personnel Commission").

4.10.   Books and Records.   The Company and Consultant shall make their books and records with respect to the Sale Event available for inspection by each other during normal business hours, such inspection not to unreasonably interfere with the operation of the Sale Event; provided, however, in no event will Company make available to Consultant any consumer personally identifiable information to the extent such action would necessitate the appointment of a consumer privacy ombudsman.

4.11     Sale Event Permits.   The Company shall obtain (with the assistance of Consultant) permits or licenses, if any, that are necessary to conduct the Sale Event.

10

4.12    Compensation to Consultant.  On and after the Commencement Date, Consultant shall receive all proceeds of the Sale.  After payment of the Guaranteed Amount, the Sales Override, the Sale Expenses and any other amounts due to Company under this Agreement, Consultant shall retain all remaining Gross Sales as its compensation for services provided pursuant to this Agreement.

5.    **Additional Merchandise**.  Consultant shall be entitled to include in the Sale Event additional merchandise procured by Consultant that is of like kind and quality to the merchandise located in the Sale Locations, including rugs (the "Additional Merchandise"). Consultant shall enter into an agreement on an exclusive basis with a rug vendor, including an affiliate of Consultant, for the sale of rugs as Additional Merchandise at the Sale Locations during the Sale Term.  At all times and for all purposes, the Additional Merchandise and its proceeds shall be the exclusive property of Consultant. The transactions relating to the Additional Merchandise are, and shall be construed as, a true consignment from Consultant to Company. The Additional Merchandise shall be at all times subject to the control of Consultant. The Company hereby authorizes Consultant to file Uniform Commercial Code financing statements to perfect the consignment of the Additional Merchandise.

6.    **Auction**.  As part of the consideration for the Guaranteed Amount and the Sales Override, prior to expiration of the Sale Term, Consultant shall have the right to conduct an auction of remaining Company Inventory and Additional Merchandise (the "Auction"). The proceeds of the Auction shall be deposited in the Sale Account and included in Gross Sales for purposes of the Sales Override.  Consultant shall set the terms of the auction, including, but not limited to, a buyer's premium, and is hereby authorized to enter into an auction agreement with the auctioneer.

7.    **Sale Event Reconciliation**

7.1.    Weekly Sale Reconciliation. Company and Consultant shall cooperate to reconcile on a weekly basis throughout the Sale Term, Sale Expenses, Non-Sale Expenses, sales taxes, Gross Sales, Sales Override and such other Sale Event-related items as either party shall reasonably request, in each case for the prior weekly period.

7.2.    Final Sale Reconciliation.    Within thirty (30) days after the Termination Date, Company and Consultant shall prepare a final reconciliation of the Sale Event including, without limitation, a summary of Gross Sales, sales taxes, Sale Expenses, Non-Sale Expenses, Sales Override and any other accountings required hereunder. Within ten (10) business days following completion of the final Sale Event reconciliation, Consultant shall pay to the Company any remaining Sale Expenses and other amounts payable to Company hereunder and release its liens. To the extent the parties are unable to resolve any matters for a final reconciliation, the Bankruptcy Court shall retain jurisdiction to resolve any such matters.

7.3.    Remaining Merchandise.    All Company Inventory remaining as of the Termination Date, if any, shall be deemed abandoned by Company; shall be deemed owned by the Consultant free and clear of all Liens but subject to any proceeds (net of expenses) from its disposition being included in Gross Sales for the Sales Override; and shall be removed by

Consultant by the Termination Date to a location (other than a Sale Location or the Distribution Center) acceptable to Consultant. Consultant also shall have removed from all Sale Locations and the Distribution Center any Additional Merchandise remaining as of the Termination Date, such Additional Merchandise being the sole property of Consultant, free and clear of all Liens. The Company shall retain responsibility for Excluded Inventory. Further, Consultant shall leave the Sale Locations and Distribution Center in a "broom clean" condition, reasonable wear and tear excepted, and shall leave in place the Excluded Inventory, fixtures, equipment, supplies and other property owned or controlled by the Company.

7.4.    Insurance. At the expense of Consultant (as a Sale Expense), the Company shall continue until the expiration of the Sale Term, in such amounts as it currently has in effect, all of its building and liability insurance policies, including, but not limited to, products liability, comprehensive public liability, auto liability, fire, flood, theft and extended coverage casualty insurance, contents insurance and umbrella liability insurance, covering injuries to person and property in, or in connection with the Company's operations of the Store Locations, and shall cause the Consultant to be named an additional insured with respect to all such liability policies and as a loss payee with respect to property coverage. Prior to the Commencement Date, the Company shall deliver to the Consultant certificates evidencing such insurance setting forth the duration thereof and naming the Consultant as an additional insured on all such insurance policies and naming the Consultant as loss payee on all insurance policies insuring the Company Inventory and Additional Merchandise, all in form reasonably satisfactory to the Consultant and at the sole expense of Consultant. All such polices shall require a least thirty (30) days prior written notice to the Consultant of cancellation, non-renewal or material change. The cost of contents and liability insurance with respect to the Sale shall be a Sale Expense. The Company shall increase the limits of any insurance coverage at the Consultant's reasonable request.

The Company shall also continue, until the expiration of the Sale Term, workers' compensation insurance (including employer liability insurance) in such amounts as it currently has in effect covering employees that work at the Sale Locations and the Distribution Center in accordance with Section 4.9 and in compliance with statutory requirements. Prior to the Commencement Date, Company shall deliver to the Consultant a certificate of its insurance broker or carrier evidencing such insurance.

8.    **Relationship of the Parties**.  The parties acknowledge and agree that nothing contained in this Agreement shall be construed to create a relationship between them as employer/employee, joint venturers, or partners. It is the intention of the parties that each party be deemed independent of the other. Nothing in this Agreement shall cause or deem to cause the Company or the Consultant to assume or have any liability, directly or indirectly, for any debt or obligation of the other. Notwithstanding anything contained in this Agreement to the contrary, Consultant shall have the right to make all final decisions regarding the operation of the Sale Event and Auction.

9.    **No Prior Representations**.  The parties hereto agree that Consultant has not guaranteed the Sale Event achieving Gross Sales benchmarks and the Company has not been induced into executing this Agreement by, or has relied upon, any projections of potential sales or profitability

of the Sale Event, other statements or other representations, except as expressly set forth in this Agreement.

10.    **Company's Representations**.

The Company hereby represents and warrants to Consultant that:

10.1.    The Company is a limited liability company duly organized and validly existing in good standing under the laws of the state of Arizona, with the full power and authority to enter into this Agreement and to consummate the transactions contemplated herein,.

10.2.    This Agreement has been duly and validly authorized by all necessary action, has been duly and validly executed and delivered, and is a valid and binding obligation of the Company enforceable in accordance with its terms.

10.3.    The Company is current with respect to all taxes owed, and there are no outstanding judgments or tax Liens against the Company or any of its assets and there are no pending or, to the Company's best knowledge, threatened actions against the Company.

10.4.    The Company has good and marketable title to its assets, including, the Company Inventory and other Consultant Collateral (as defined below), free and clear of all security interests, liens or encumbrances of any nature whatsoever (collectively, "Liens"), except for Liens granted to or held by the entities set forth on Exhibit D attached hereto (collectively, to the extent the Liens are properly perfected and up to the value of the collateral as of the Petition Date, the "Secured Parties") which Liens on Company Inventory shall be released pursuant to the terms of Sections 3.3, 3.5 and 3.6 above.  The Company shall not create or permit to exist any Lien on any asset of the Company without prior written consent of Consultant.

10.5.    The financial, sales, inventory and other information provided by the Company to Consultant prior to the date of this Agreement, or hereafter delivered to Consultant, are accurate in all material respects and fairly present the financial and business condition of the Company; and Company acknowledges that Consultant has relied on the accuracy of the foregoing information in entering into this Agreement.

10.6.    The Company has operated its business in the ordinary course and since January 1, 2015 has not conducted any promotional sales event outside the ordinary course of business. The Company has not transferred any merchandise to or from the Sale Locations in anticipation of the Sale Event.

11.    **Consultant's Representations**.    Consultant hereby represents and warrants to the Company that:

11.1.    Each entity included within Consultant is a limited liability company duly organized and validly existing in good standing under the laws of the state of its formation, with the full power and authority to enter into this Agreement and to consummate the transactions contemplated herein.

13

11.2.   This Agreement has been duly and validly authorized by all necessary corporate action, has been duly and validly executed and delivered, and is a valid and binding obligation of Consultant enforceable in accordance with its terms.

12.   **Default**.

12.1.   The occurrence of any of the following is an event of default ("Event of Default"):

(a)   the failure of the Company to perform any of its obligations under this Agreement or the Approval Order, which failure is not remedied within three (3) days after the Company has received written notice from Consultant of such failure;

(b)   any representation or warranty made by the Company shall prove to be untrue in any material respect as of the date when made;

(c)   any of the Company's property is attached, or a receiver or trustee is appointed for the Company;

(d)   conversion of the Chapter 11 Case of the Company to any subsequent case under Chapter 7 of the Bankruptcy Code or otherwise; dismissal of the Chapter 11 Case of the Company or any subsequent case under Chapter 7 of the Bankruptcy Code; or the entry of any order modifying, revoking, staying or vacating the Order without the prior written consent of the Consultant;

(e)   a substantial portion of the Company Inventory is destroyed, encumbered, seized, or confiscated or, by acts or omissions of the Company a substantial portion of the Additional Merchandise is destroyed, encumbered, seized, or confiscated; or

(f)   the Sale Event or Auction is terminated by a party other than Consultant and the Sale Event or Auction is not resumed as of the fifth (5th) day thereafter.

12.2.   Upon the occurrence of an Event of Default, Consultant shall have the right to (a) immediately terminate the Sale Event or Auction and enforce its security interest in the Consultant Collateral (defined herein) under the Uniform Commercial Code as adopted in the State of Arizona (the "UCC") including the right to conduct a public or private sale of the Consultant Collateral pursuant to the UCC (in such case Company agrees that Consultant shall give 10-days' notice in writing of the time and place of public sale of the Consultant Collateral, or, if the sale is a private sale or some other disposition other than a public sale of the Consultant Collateral, then the time on or after which the private sale or other disposition is to be made; and, Lender may credit bid at any public sale); (b) assert all of its rights and remedies under this Agreement; and (c) assert all of its rights and remedies under law or in equity. Upon termination

14

of the Sale Event or Auction, the parties shall conduct a final Sale Event reconciliation as provided in Section 7.2 above.

12.3.    There shall not at any time be entered in a Chapter 11 Case or any subsequent Chapter 7 case any bankruptcy court order which, without the consent of Consultant (i) authorizes the use of the Consultant Collateral or the Gross Sales as cash collateral, or authorizes the sale, lease, or other disposition of property of the estate of the Company to the extent such sale, lease, or other disposition of property would interfere with Consultant's rights under this Agreement; or (ii) under 11 U.S.C. Section 364 of the Bankruptcy Code authorizes the obtaining of credit or the incurring of indebtedness secured by a Lien senior to the Lien granted to the Consultant hereunder, or which is entitled to priority administrative status.    The parties acknowledge that the proceeds from the Company Inventory are not cash collateral.

13.    **Security Interest**.  The Company hereby grants and pledges to Consultant, a priority security interest and lien in the Consultant Collateral to secure all obligations and liabilities of the Company to Consultant, now existing or later incurred, including, without limitation, the Advances and the Company's obligation to pay and satisfy all Non-Sale Expenses and Pre-Sale Order Expenses. "Consultant Collateral" means all of the Company's right, title and interest in and to (a) the Company Inventory and the Excluded Inventory, (b) accounts receivable, (c) fixtures, furniture and equipment, (d) intellectual property rights including trademarks, tradenames, copyrights and patents, (e) goods, (f) contracts, (g) promissory notes, (h) general intangibles, (i) all rights of the Company under the terms of this Agreement, including, without limitation, amounts due or to become due to the Company under the terms of this Agreement, (j) all funds in the Sale Account and Pre-Sale Order Account, and (k) all proceeds (including any insurance proceeds and credit card receivables), of and to all of the foregoing. The Company hereby authorizes Consultant to file Uniform Commercial Code financing statements to perfect the security interests in the Consultant Collateral.

14.    **Miscellaneous**.

14.1.    Binding Effect; Assignments.  This Agreement shall be binding upon and inure to the benefit of the Company and Consultant and their respective, successors and assigns.  Neither party may assign its rights or obligations under this Agreement without the prior written consent of the other.

14.2.    Titles.  The titles of the Articles and Sections of this Agreement are inserted merely for convenience and ease of reference and shall not affect or modify the meaning of any of the terms, covenants or conditions of this Agreement.

14.3.    FF&E Disposition.  With respect to furniture, fixtures and equipment owned by Company and located at the Sale Locations and Distribution Center (collectively, the "FF&E"), if requested by Company, the Consultant may sell the FF&E in the Sale Locations.  In the event the Consultant sells the FF&E, the Consultant shall be entitled to receive a commission equal to twenty (20%) of the proceeds from the sale of such FF&E, net of expenses incurred in connection with the disposition of the FF&E.  The Consultant may abandon in place, any unsold FF&E at the Sale Locations.

15

14.4. <u>Notices</u>. Any notice provided for herein shall be in writing and shall be deemed to have been given when: (i) personally delivered; (ii) when sent by telecopier and confirmed within forty-eight (48) hours by letter mailed or delivered to the party to be notified; (iii) one (1) business day after delivery by national overnight courier service with next business day delivery; or (iv) three (3) days following deposit for mailing by first class registered or certified mail, return receipt requested. Notices shall be delivered to the addresses set forth below:

If to the Company, to:    The RoomStores of Phoenix, LLC,
d/b/a The RoomStore
3011 East Broadway
Phoenix, AZ 85040
Attention: Alan Levitz

with a copy to:    Dickinson Wright
1850 North Central Avenue, Suite 1400
Phoenix, AZ 85004
Attention: Carolyn J. Johnsen

If to Consultant, to:    International Rug Group, LLC
738 Hopmeadow Street
Simsbury, CT 06070
Attention: Mark Bannon

    and

Watch Hill Furniture Capital, LLC
3022 South Morgan's Point Road, #302
Mount Pleasant, SC 29466
Attention: Burton Homonoff

    and

SB Capital Group, LLC
1010 Northern Boulevard
Great Neck, NY 11021
Attention: Robert Raskin

with a copy to:    Cohen Tauber Spievack & Wagner P.C.
420 Lexington Avenue, Suite 2400
New York, NY 1003
Attention: Robert A. Boghosian

14.5. <u>Waiver</u>. No waiver by a party hereto of a breach or default hereunder by the other party shall be considered valid, unless in writing signed by such first party.

16

14.6. <u>Entire Agreement</u>. This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof, and supersedes any and all prior agreements or understandings between the Company and Consultant, whether written or oral, relating to any or all matters covered by and contained or otherwise dealt with in this Agreement.

14.7. <u>Amendment</u>. No modification, change or amendment of the Agreement or any of its provisions shall be valid, unless in writing and signed by both parties.

14.8. <u>Applicable Law</u>. This Agreement shall be governed by and construed in accordance with the substantive laws of the State of Arizona. The Company and Consultant hereby agree and acknowledge that any monetary damage claim that either party may have against the other shall be limited to actual damages and losses and shall not include punitive, consequential, special or indirect damages.

14.9. <u>Third Party Beneficiaries</u>. This Agreement and any document related thereto shall not create, or be deemed or construed to have created, any third party beneficiary rights.

14.10. <u>Counterparts</u>. This Agreement may be executed in multiple counterparts and by facsimile, pdf, or other electronic signature and each such counterpart shall be deemed an original and all counterparts shall constitute one and the same instrument.

14.11. <u>Severability</u>. If any provision of this Agreement, or the application thereof, to any extent is held by any court of competent jurisdiction to be invalid, illegal, or unenforceable for any reason whatsoever, the remainder of this Agreement, or the application of such term or provision shall not be affected thereby.

14.12. <u>Further Assurances</u>. The Company shall cooperate and take such further action and shall execute and deliver such further documents as may be reasonably requested by the Consultant in order to carry out the provisions and purposes of this Agreement.

14.13. <u>Approval Order</u>.

(a) The Company shall use its best efforts to obtain an order from the Bankruptcy Court assuming this Agreement (the "<u>Approval Order</u>") as part of so-called "first day orders" or on such other expedited basis. The Approval Order shall be in form and substance acceptable to Consultant and shall include, without limitation (i) that the Agreement is approved in its entirety and that Consultant shall be allowed to conduct the Sale in accordance with the terms of the Agreement without compliance with any going-out-of business laws, rules and regulations, (ii) that Consultant shall have the exclusive right to use the Company's names, trademarks and trade names, intangible rights and Sale Locations to conduct the Sale for the Sale Term utilizing the phrase and concept in all advertising at the Sale Locations or otherwise of "going-out-of-business", "bankruptcy liquidation", "store closing" or similar theme sale, (iii) that landlords and mortgagees of the Sale Locations, utility companies, governmental agencies, sheriffs or other public officers and creditors shall not interfere with or otherwise impede the conduct of the Sale or application of the proceeds thereof, (iv) Consultant on a consignment basis, may

{00276321.DOCX; 4}

introduce new merchandise (without restriction as to type of inventory) into the Sale Locations during the Sale (which consignment by Consultant shall be deemed perfected without the necessity of filing, recording or serving any financing statements or other document), and (v) such other matters requested by Consultant consistent with this Agreement.

(b)     The terms and provisions of this Agreement and the Approval Order and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered confirming or consummating any plan of reorganization of the Company or which may be entered converting the Chapter 11 Case to a case under Chapter 7, and the terms and provisions of this Agreement as well as the rights and interests granted pursuant to this Agreement and the Approval Order shall continue in any superseding case under the Bankruptcy Code.

The Approval Order shall be deemed a final order upon its docketed entry by the Bankruptcy provided there is no stay.

**[SIGNATURE PAGE TO FOLLOW]**

18

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement.

**COMPANY:**

**THE ROOMSTORES OF PHOENIX, L.L.C.,
D/B/A THE ROOMSTORE**

By: _____

Name: ALAN LEVITZ

Title: MANAGING MEMBER

**CONSULTANT:**

**INTERNATIONAL RUG GROUP, LLC**

By: _____
Name: _____
Title: _____

**WATCH HILL FURNITURE CAPITAL, LLC**

By: _____
Name: _____
Title: _____

**SB CAPITAL GROUP, LLC**

By: _____
Name: _____
Title: _____

19

{00276321.DOCX; 4}

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement.

COMPANY:

**THE ROOMSTORES OF PHOENIX, L.L.C.,**
**D/B/A THE ROOMSTORE**

By: _____
Name: _____
Title: _____

CONSULTANT:

**INTERNATIONAL RUG GROUP, LLC**

By: _____
Name: _MARK BARKIN_____
Title: _Pres. & CEO_____

**WATCH HILL FURNITURE CAPITAL, LLC**

By: _____
Name: _____
Title: _____

**SB CAPITAL GROUP, LLC**

By: _____
Name: _____
Title: _____

{00276321.DOCX. 4}

19

Scanned by CamScanner

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement.

**COMPANY:**

**THE ROOMSTORES OF PHOENIX, L.L.C.,
D/B/A THE ROOMSTORE**

By: _____
Name: _____
Title: _____

**CONSULTANT:**

**INTERNATIONAL RUG GROUP, LLC**

By: _____
Name: _____
Title: _____

**WATCH HILL FURNITURE CAPITAL, LLC**

By: _____
Name: *BURTON HOMONOFF*
Title: *PRESIDENT*

**SB CAPITAL GROUP, LLC**

By: _____
Name: _____
Title: _____

{00276321.DOCX; 4}

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement.

COMPANY:

**THE ROOMSTORES OF PHOENIX, L.L.C., D/B/A THE ROOMSTORE**

By: _____
Name: _____
Title: _____

CONSULTANT:

**INTERNATIONAL RUG GROUP, LLC**

By: _____
Name: _____
Title: _____

**WATCH HILL FURNITURE CAPITAL, LLC**

By: _____
Name: _____
Title: _____

**SB CAPITAL GROUP, LLC**

By: *Thomas Mitchell*
Name: *Thomas Mitchell*
Title: *Principal*

**EXHIBIT A**

**[SALE LOCATIONS AND DISTRIBUTION CENTER AND OCCUPANCY EXPENSES]**

{00276321.DOCX; 4}

**Room Store**
**Exhibit A**

| St# | Location | AKA | Address | City, State | Zip | Rent | Prop Taxes | CAM | Total |
|---|---|---|---|---|---|---|---|---|---|
| 01 | Paradise | PV | 13637 N Tatum Blvd | Phoenix, AZ | 85032 | 785.63 | 187.86 | 170.22 | 1,143.70 |
| 02 | Glendale | Bell | 16880 W 59th Ave | Glendale, AZ | 85308 | 936.30 | 131.67 | 82.83 | 1,150.80 |
| 03 | Northern | | 3539 W Northern Ave | Phoenix, AZ | 85051 | 464.73 | 73.33 | 43.33 | 581.40 |
| 06 | Superstition | Southern | 6315 E Southern Ave | Mesa, AZ | 85206 | 643.37 | 91.73 | 66.40 | 801.50 |
| 07 | Ahwatukee | Ray Rd | 4633 E Ray Rd | Phoenix, AZ | 85044 | 1,249.43 | 42.56 | 310.66 | 1,602.64 |
| 08 | Fiesta | Alma School | 1661 S Alma School Rd | Mesa, AZ | 85210 | 1,870.61 | 390.34 | 66.33 | 2,327.29 |
| 09 | Scottsdale | | 15826 N Scottsdale Rd | Phoenix, AZ | 85254 | 2,098.58 | 206.67 | 17.43 | 2,322.68 |
| 11 | Goodyear | | 555 N Litchfield Rd | Goodyear, AZ | 85338 | 1,510.26 | 236.67 | 65.78 | 1,812.70 |
| 12 | Prescott | | 3090 Gateway Blvd | Prescott, AZ | 86303 | 1,238.58 | 166.67 | 11.42 | 1,416.67 |
| 14 | Casa Grande | | 1325 E Florence Blvd | Casa Grande, AZ | 85122 | 1,076.39 | 170.50 | 82.94 | 1,329.83 |
| 15 | Happy Valley | | 2501 W Happy Valley Rd #28 | Phoenix, AZ | 85027 | 1,158.43 | 165.23 | 155.22 | 1,478.89 |
| 05/98 | Clearance Center | | 1661 S Alma School Rd | Mesa, AZ | 85210 | | | | Note 1 |
| | Distribution Center | | 3011 East Broadway | Phoenix, AZ | 85040 | | | | 5,490.06 |

Note 1 - amounts for the Clearance Center are included in St# 08, Fiesta

**EXHIBIT B**

**[EXCLUDED ITEMS]**

The following categories are considered "no value" and excluded from Company Inventory:

- Used furniture and unsalable Items
- Returned bedding
- Table tops without bases
- Table bases without tops
- Leafs to dining room tables without corresponding tables
- Hutch tops without matching bases
- Footboards without matching headboards
- Bed rails without beds
- Odd glass shelves and glass panels, glass tops without bases
- Upholstery without cushions
- Dining chairs without seat cushions/panel
- Chairs missing legs
- Case furniture missing drawers, tops or sides
- Lamp shades without lamps
- Upholstered sectional furniture pieces or sections without matching components
- Any furniture or bedding that does not meet required governmental fire and safety codes for legal sale in given market(s)
- Props and display-prop models (i.e.: sales aides such as bedding or furniture with cut-outs for internal display)
- Display rugs on floors
- Electronic parts, cables, remotes and components
- SKU's that were utilized for store FF&E (i.e.: desks, chairs, tables, etc. that were taken from inventory and used in daily operations at sale locations)
- Store FF&E, office furniture, cabinets, etc.
- Fabric swatches, display racks
- Misc. Parts: bed slats, hooks, nuts, bolts, glass repair parts, shelves, drawer fronts, hardware, cushion cores, fabric panels, foam, Dacron wrap, odd legs, wood panels, lamp parts, harps, finials, etc.

**EXHIBIT C**

**[BUDGET WITH INITIAL ADVANCE]**

{00276321.DOCX; 4}

# Room Store
## Exhibit C

| Line item | % | Week Ending 12-Dec | 19-Dec | 26-Dec | 2-Jan | 9-Jan | 16-Jan | 23-Jan | 30-Jan |
|---|---|---|---|---|---|---|---|---|---|
| LY Sales | | 1,221,004.00 | 1,346,227.00 | 1,182,534.00 | 1,368,035.00 | 1,255,329.00 | 1,216,038.00 | 1,243,190.00 | 1,223,826.00 |
| December MTD comp | -37.70% | | | | | | | | |
| Estimated TY sales | | 760,685.49 | 838,699.42 | | | | | | |
| Opening Cash | | (308,737.20) | 230,322.08 | 33,096.91 | 84,459.55 | 128,821.35 | 5,352,509.40 | 4,219,145.81 | 3,844,134.83 |
| Inflows | | 1,579,147.19 | 914,182.37 | 374,462.63 | 390,595.13 | 5,553,988.05 | 477,391.00 | 490,682.63 | 574,462.63 |
| Outflows | | 1,040,087.90 | 1,111,407.54 | 323,100.00 | 346,233.33 | 330,300.00 | 1,610,754.59 | 865,693.61 | 805,564.89 |
| Closing Cash | | 230,322.08 | 33,096.91 | 84,459.55 | 128,821.35 | 5,352,509.40 | 4,219,145.81 | 3,844,134.83 | 3,613,032.57 |
| Opening Inventory | | 7,500,000.00 | 7,614,657.25 | 7,690,307.54 | 7,690,307.54 | 7,690,307.54 | 7,690,307.54 | 7,690,307.54 | 7,690,307.54 |
| Receipts | | 495,000.00 | 495,000.00 | - | - | | | | |
| Deliveries | 50% | 380,342.75 | 419,349.71 | - | | | | | |
| Closing Inventory | | 7,614,657.25 | 7,690,307.54 | 7,690,307.54 | 7,690,307.54 | 7,690,307.54 | 7,690,307.54 | 7,690,307.54 | 7,690,307.54 |
| Opening Vendor Payables | | 5,917,291.00 | 5,917,291.00 | 5,917,291.00 | 5,917,291.00 | 5,917,291.00 | 5,917,291.00 | 5,917,291.00 | 5,917,291.00 |
| Receipts | | | | | | | | | |
| Payments | | | | | | | | | |
| Closing Vendor Payables | | 5,917,291.00 | 5,917,291.00 | 5,917,291.00 | 5,917,291.00 | 5,917,291.00 | 5,917,291.00 | 5,917,291.00 | 5,917,291.00 |
| **Cash Outflows:** | | | | | | | | | |
| Vendor Payments | | | | | | | | | |
| Payroll | | 434,923.13 | 445,833.33 | 230,000.00 | 250,833.33 | 230,000.00 | 375,833.33 | 230,000.00 | 230,000.00 |
| Payroll Taxes/Benefits | | 6,154.91 | | | | 7,900.00 | | 70,000.00 | |
| Sales Tax | | | | | | | 550,000.00 | 150,000.00 | 400,000.00 |
| Expense vendors | | 104,009.86 | 95,574.21 | 93,100.00 | 95,400.00 | 92,400.00 | 98,089.85 | 86,400.00 | 93,100.00 |
| Vendor Deferred | | **495,000.00** | **495,000.00** | | | | | | |
| Landlords | | | | | | | 586,831.41 | 254,293.61 | 82,464.89 |
| Advertising | | | | | | | | | |
| Secured Payments | | - | 75,000.00 | - | | | - | 75,000.00 | |
| Professional Fees | | - | - | - | | | | | |
| Expense Vendors Deferred | | - | - | - | | | | | |
| | | 1,040,087.90 | 1,111,407.54 | 323,100.00 | 346,233.33 | 330,300.00 | 1,610,754.59 | 865,693.61 | 805,564.89 |
| **Cash Inflows:** | | | | | | | | | |
| Cash Proceeds | | 760,685.49 | 838,699.42 | | | | | | |
| CC Proceeds | | | | | | | | | |
| Financing Proceeds | | | | | | | | | |
| Sales tax collected | 9.00% | 68,461.69 | 75,482.95 | | | | | | |
| Payroll | 67.50% | | | 155,250.00 | 169,312.50 | 155,250.00 | 253,687.50 | 155,250.00 | 155,250.00 |
| Payroll Taxes/Benefits | 67.50% | | | | | 5,332.50 | | 47,250.00 | |
| Sales Tax | 50.00% | | | | | | | 75,000.00 | 200,000.00 |
| Expense vendors | 90.00% | | | 83,790.00 | 85,860.00 | 83,160.00 | 88,280.87 | 77,760.00 | 83,790.00 |
| Landlords | | | | 135,422.63 | 135,422.63 | 135,422.63 | 135,422.63 | 135,422.63 | 135,422.63 |
| Guarantee | 105.00% | 750,000.00 | | | | 7,324,822.92 | | | |
| Minimum Sales Override | | | | | | 450,000.00 | | | |
| Paymet to secured | | | | | | (2,600,000.00) | | | |
| Consultant Advances | | | | | | | | | |
| | | 1,579,147.19 | 914,182.37 | 374,462.63 | 390,595.13 | 5,553,988.05 | 477,391.00 | 490,682.63 | 574,462.63 |

# EXHIBIT D

# SECURED PARTIES

The Secured Parties, as that term is defined in the Sale Promotion Consulting Agreement, are as follows, provided that nothing herein waives or releases any rights to contest the validity, perfection, extent, or enforceability of any security interests:

1. Broyhill Furniture Industries Inc.  (Initial Fin. Stmt. #200412943947, Jan. 15, 2004)

2. Heritage Home Group LLC (formerly Furniture Brands International, Inc.) (Initial Fin. Stmt. #201016205150, Jul. 13, 2010)

3. Synchrony Bank (formerly GE Money Bank) (Initial Fin. Stmt. #201016225665, Jun. 30, 2010)

4. Sealy, Inc. and Sealy Mattress Company (Initial Fin. Stmt. #201116573566, Jul. 15, 2011)

5. BOKF, NA. and Bank of Arizona (involves note and letter of credit issued for the benefit of Synchrony Bank) (Initial Fin. Stmt. #201500288610, Aug. 21, 2015)

6. American Express Bank, FSB (Initial Fin. Stmt. #201500368793, Oct. 29, 2015)

# EXHIBIT E

## [PRE-SALE ORDER CALCULATION FORMULA]

**The RoomStore**
**Exhibit E**
**Example of Pre-Sale Order Formula**

| | | | |
|---|---|---:|---|
| Estimated Retail Sale Orders (inclusive of Sales tax and delivery charge) | | 3,790,474.00 | |
| Estimated Retail Sale Orders (merchandise only) | | 3,409,586.00 | |
| Estimated Deposits collected | 42.21% | 1,599,772.00 | |
| Estimated Remaining COD | | 2,190,702.00 | |
| Reserved Retail Inventory | | 1,490,229.00 | |
| Estimated Cost of Sale Orders | 50.70% | 1,728,660.10 | |
| Estimated Cost Inventory OH | 37.00% | 735,327.00 | |
| Estimated Additional Cost Inventory needed | 63.00% | 993,333.10 | |
| | | | |
| Additional Expenses incurred to fulfill: | | | |
| Commissions | 7.00% | 265,333.18 | |
| Finance Fees | 9.00% | 85,285.67 | 25% |
| CC Fees | 2.00% | 53,066.64 | 70% |
| Handling | 10.00% | 379,047.40 | |
| | | 782,732.88 | |
| | | | |
| Amount to be received | | 1,599,772.00 | |
| Amount due to others | | 1,776,065.98 | |
| Estimated Delivery income | 3422 | 222,430.00 | |
| Sales tax out | 8.00% | (272,766.88) | |
| Net (shortfall)/excess | | (226,630.86) | |

Created using the SOR and MISR reports dated 12/08/15