Carolyn J. Johnsen, (#011894)
cjjohnsen@dickinsonwright.com
M. Kimberly Stagg (TN #16820)
kstagg@dickinsonwriht.com - *Pro Hac Vice Pending*
**DICKINSON WRIGHT PLLC**
1850 North Central Avenue, Suite 1400
Phoenix, Arizona 85004
Phone: (602) 285-5000
Fax: (602) 285-5100
*Proposed Attorneys for Debtor*

# IN THE UNITED STATES BANKRUPTCY COURT

# FOR THE DISTRICT OF ARIZONA

| In re: | Chapter 11 Proceeding |
|---|---|
| THE ROOMSTORES OF PHOENIX, L.L.C., d/b/a THE ROOMSTORE, | No. 2:15-bk-15898-DPC |
| Debtor. | **DECLARATION OF ALAN LEVITZ** |

I, Alan Levitz hereby declare and state as follows:

**Overview of the Company and My Experience**

1. I am the managing member of the Debtor (also referred to as the "Company") and oversee all operations of the business.

2. The Debtor is a furniture retailer providing premier furniture and accessories for a low price. It currently operates 11 leased showroom locations, each known as the "RoomStore," including 9 located in the Phoenix, Arizona metropolitan area, one in Casa Grande, Arizona, and one in Prescott, Arizona (also referred to as the "Locations"). One Location, on Alma School Road, consists of two storefronts including a Clearance Center and a full line store. The Debtor also leases a warehouse from which it fills furniture orders and deliveries.

3. I have been directly involved in the furniture business for over 23 years beginning with a business run by my cousins and great uncle, Leon Levitz who co- founded Levitz Furniture, a large national furniture chain

4. In 1993, my father and I decided to open the Company in Phoenix. Shortly thereafter we invited our cousin Dan Selznick to join us as a partner as he had extensive experience in the furniture industry. I have been running operations for the company for most of our 22 years in business while Dan ran the merchandising and marketing aspects.

5. The Debtor is an Arizona Limited Liability Company consisting of members Alan Levitz (33.5%), Phillip Levitz (33.5%) and Dan Selznick (33.0%).

6. Current upper management includes Mark Hendricks as the controller, Margaret Raborn as Merchandise Manager, Jeff Conti as Warehouse Operations Manager, Mike Norris as Sales Director, and a store manager for each of the Locations. The Company has approximately 350 employees.

7. In addition to my role in operating the Debtor, I gained extensive experience in the furniture retail industry when I was asked to step in as the "designated responsible party" for a Chapter 11 case filed in Sacramento, California in June of 2008 by the RoomSource, a company owned by Phillip Levitz, Dan Selznick and another cousin, Harris Blickstien.

8. After my appointment, I immediately began investigating the state of the company and found that the liquidator it had hired was essentially bleeding the company. This conclusion was also reached by the United States Trustee in the case as well as by the creditors committee. I successfully terminated the liquidator and recovered for the estate sizeable amounts in over-charged expenses and commissions and prevented any further depletion of the estate.

**The Debtor's Assets and Liabilities**

9. The Debtor's assets consist principally of furniture and accessories inventory believed to have a value of approximately $8 million; accounts receivable in the approximate amount of $250,000; Company furniture, fixtures and equipment believed to have a value of approximately $325,000; and the rights pursuant to a Consulting Agreement described below.

10. The Debtor's secured debt consists of the following: a) Broyhill Furniture Industries Inc./Heritage Home Group LLC in the approximate amount of $190,000; and b) Sealy, Inc. in the approximate amount of $984,000, each allegedly secured by a purchase money security interest in certain furniture inventory and the resulting proceeds.

11. The Debtor is current on all taxes and is in arrears for one month's rent for its leases of the Locations and warehouse. Unsecured debt is approximately $9,000,000.

**History of the Debtor and Circumstances Leading Up to the Bankruptcy Filing**

12. The Company began in 1993 with two stores and over the years expanded to a multiple locations in the Phoenix Metropolitan Area and further expanded to Prescott, Arizona and Casa Grande, Arizona.

13. Prior to the severe economic downturn in 2008, the Company had as much as $125 million in annual gross sale revenues. The housing market crash that began in 2008 severely affected the retail furniture industry, and along with all retailers, the Company suffered dramatic declines.

14. However, even when the market began to improve, competition among furniture retailers in the same genre as the RoomStores increased significantly and the Company could no longer generate the revenues it had accomplished in the past. Because of the increased competition, margins were reduced substantially.

15. Gross sales revenues were approximately $76,200,000 in 2013, about $70,700,000 in 2014, and are expected to total about $63,000,000 for 2015. The Company had net income of about $765,000 in 2013, but suffered a loss of about $476,000 in 2014, and expects the loss in 2015 will quadruple because of the rapid margin decline.

16. I recognized the immediate need to stem the losses, maintain cash flow and find a solution that would protect vendors and other creditors. Consequently, I began, in the third quarter of 2015, to entertain the possibility of hiring a company to assist with a promotional or liquidation sale. Given my previous experience with a liquidator, I was particularly cautious in determining whether to proceed down this path.

17. Several companies in the furniture sale/liquidation business contacted me but none of the proposals were acceptable.

18. In or about November 2015, I received a recommendation from a trusted colleague regarding a promotional sales joint venture group led by International Retail Group, and including Watch Hill Furniture and SB Capital Group (referred to as the "Consultant").

19. I began discussions regarding a plan in which the Consultant would provide management expertise and funding in order to provide the Company with advances to pay certain operating costs and then Consultant would conduct a sale of the Debtor's inventory. Such an agreement contemplated a Chapter 11 bankruptcy filing in order to facilitate the process and provide a respite from certain aggressive creditors. I had already considered that Chapter 11 might be a viable option for the Company.

20. As I proceeded with the negotiations with the Consultant, I wanted to vet the proposal and ascertain whether there were any better alternatives.

21. I contacted the representatives of two well-established furniture liquidators and described to them the Consultant's proposal. Neither of them could match the terms.

22. A third liquidator I contacted indicated that he could not match the Consultant's proposal but believed he could simply provide better service. He indicated that it sounded like a generous deal which should be lucrative for the RoomStore.

22. I also contacted the credit manager of one of our larger vendors and received a positive report on her company's experience in working with the Consultant.

As part of my due diligence, I reviewed the percentages of recovery in similar bankruptcy liquidation sales. I found that the guaranteed up-front payment in other cases was significantly lower than the 105% offered by the Consultant. For example, in the cases of In re DD-OH Family Partners, LLC, In re Paul Rosa, Inc., and In re Wickes Furniture Company, Inc., the percentages were only 85%, 73%, and 50.25% respectively

23. The Consultant's proposal entailed a sizeable up-front payment and a guaranteed percentage of the profits. Because the Consultant's expenses are paid directly out of sales, there is no effect on the amounts preserved for the creditors. Should sales exceed the minimum guaranteed percentage, there will be more money paid to the estate for the benefit of the creditors. If sales do not meet expectations, the amounts paid up front are still preserved for the benefit of the creditors. This appears to be a much cleaner arrangement than the others I have reviewed and experienced where the estate bears the burden of the liquidator's expenses.

24. Finally, it became clear that the Consultant would be able to start immediately, and thus capture January sales which are traditionally the highest of the year. If we miss the January selling season, the outcome of the sales event would likely be significantly worse and potentially further erode the benefit to the creditors.

25. The ability for the Consultant to conduct a large sale event immediately is the best solution to stop the fiscal drain the company has been experiencing. I have been unable to obtain secure a source of funds to pay operational expenses and believed that the advances from the Consultant and up-front payments would allow the Company to continue long enough to have an orderly and profitable sale of inventory. The Agreement was negotiated in good faith and at arm's length. The Consultant is unrelated to the Debtor or any insiders.

26. Based on all of the above, I felt the most prudent course was to move forward with the Consultant and on December 11, 2015, I executed on behalf of the Company a Sale Promotion Consulting Agreement (the "Agreement").

25. I believe the Agreement is in the best interest of the estate and creditors.

26. Consistent with the Agreement, I authorized the filing of the Chapter 11 petition.

**The First Day Motions**

27. I have reviewed the First Day Motions filed on behalf of the Company and believe they accurately depict the immediate relief necessary to continue operations and effectuate the sale events contemplated by the Agreement.

28. The Company would suffer extreme harm if it is unable to pay pre-petition wages in that employees would likely quit at a time when their assistance is vital. Moreover, many of the employees are low-wage earners and clearly rely on each paycheck to make ends meet.

29. The Company would also suffer extreme harm if it is unable to honor Customer Programs regarding deposits, financing and gift certificates. Maintaining good customer relations is critical as the Debtor begins the sales events.

30.  The Company would also suffer extreme harm if it is unable to continue its utility services without disruption.

31.  I believe the relief sought through the First Day Motions will allow the Debtor to maximize the estate and greatly enhance the ultimate distribution to creditors and therefore is is in the best interest of creditors, the estate and parties in interest.

I declare under penalty of perjury that the foregoing is true and correct.

DATED: December 18, 2015.

/s/ Alan Levitz
**ALAN LEVITZ**

PHOENIX 53406-11 265653v1

-7-
Case 2:15-bk-15898-DPC    Doc 12    Filed 12/18/15    Entered 12/18/15 19:30:18    Desc
Main Document    Page 7 of 7